**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VARNEY E. JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:13CV244SNLJ(ACL)** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the denial of the

application of Varney E. Jones for Disability Insurance Benefits under Title II of the Social

Security Act and Supplemental Security Income under Title XVI of the Act.   The cause was

referred to the undersigned United States Magistrate Judge for a Report and Recommendation

pursuant to 28 U.S.C. § 636 (b).   Plaintiff has filed a Brief in Support of Plaintiff's Complaint.

(Doc. 15.)   Defendant has filed a Brief in Support of the Answer.   (Doc. 20.)

**Procedural History**

On May 17, 2010, Plaintiff filed his applications for benefits, claiming that he became

unable to work due to his disabling condition on April 28, 2010.   (Tr. 152-64).   Plaintiff's

claims were denied initially.   (Tr. 90-92.)   Following an administrative hearing, Plaintiff's

claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated October 11,

2011.   (Tr. 7-22.)   He then filed a request for review of the ALJ's decision with the Appeals

Council of the Social Security Administration ("SSA"), which was denied on December 5, 2012.

(Tr. 1-6.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner.   <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

**<u>Evidence Before the ALJ</u>**

A.   **<u>ALJ Hearing</u>**

Plaintiff's administrative hearing was held on September 8, 2011.   (Tr. 25.)   Plaintiff was present and was represented by counsel.   <u>Id.</u>   Also present was vocational expert Linda Talley; and witness Leticia Mitchell.   <u>Id.</u>

The ALJ examined Plaintiff, who testified that the only medication he was taking at the time of the hearing was Keppra.[1]   (Tr. 28.)   Plaintiff stated that he was recently prescribed an additional medication, but he did not remember the name of the medication.   <u>Id.</u>

Plaintiff testified that he was thirty-one years of age, and had been married approximately four years.   (Tr. 30.)   Plaintiff stated that he lived in an apartment with his wife and his three children; the children are aged fifteen, six, and four.   <u>Id.</u>   The four-year-old attends pre-school. <u>Id.</u>

Plaintiff testified that he graduated from high school, and did not take any college classes. (Tr. 31.)   He is able to read, write, and perform simple arithmetic.   (Tr. 31-32.)   He is five-feet, nine-inches tall, and weighs 135 pounds.   (Tr. 32.)   Plaintiff has a computer, an email account, and a Facebook account.   <u>Id.</u>   He does not use the computer often.   <u>Id.</u>

Plaintiff stated that he spent a month-and-a-half in jail for a gun charge.   (Tr. 33-34.)

Plaintiff testified that he has no household income, he does not receive food stamps, and he filed an unemployment claim, but it was denied.   (Tr. 34.)   Plaintiff stated that he has no medical

---

[1]Keppra is an antiepileptic drug indicated for the treatment of primary generalized tonic-clonic seizures.   <u>See</u> <u>Physician's Desk Reference</u> ("PDR"), 1161 (63rd Ed. 2009).

insurance.  (Tr. 35.)

Plaintiff testified that he last worked approximately one month prior to the hearing.  Id. Plaintiff stated that he worked at Chili Mac's as a steam table operator, which involved putting chili on food.  Id.  He also worked for this company in 2010.  Id.  He worked part-time both times he worked for this employer, because he was unable to stand long enough to work full-time. (Tr. 36.)  Plaintiff testified that he left this position, because he experienced a seizure that required him to be hospitalized for two weeks.  Id.  Plaintiff stated that he was in a lot of pain and was no longer able to perform the duties of the position.  Id.

Plaintiff testified that he worked for Tucker's Place from 2004 through 2010 as a cook and prep cook.  (Tr. 36-37.)  Plaintiff stated that he experienced his first seizure while working at this position.  (Tr. 37.)  Plaintiff testified that his employer told him not to come back after he had the seizure.  Id.

Plaintiff testified that he worked at the Pasta House prior to working for Tucker's Place; he was a busboy initially and later worked as a dishwasher and cook.  (Tr. 38.)  Plaintiff testified that he is not sure why he left this position.  Id.

Plaintiff stated that he also worked as a janitor for a temp service (Tr. 39), a pallet jack operator (he was terminated form this position because he did not meet quota), and in the warehouse at UPS where he loaded trucks.  (Tr. 40.)

Plaintiff testified that he experienced his first seizure in March of 2010.  (Tr. 41.)  In the prior ten years, he experienced "a couple of blackouts," but did not believe they were seizures.  Id. Plaintiff has been taking medication for his seizures since March 2010.  Id.  Plaintiff testified that

on one occasion his Dilantin[2] level was not at the appropriate level, because he had run out of medication and did not have the funds to get it refilled.   Id.

Plaintiff testified that he uses marijuana "once or twice every two or three weeks"; he smokes "maybe a joint and a half" each time he uses marijuana.   (Tr. 42.)   His doctors have not told him to quit smoking marijuana, although they told him to stop drinking when he was first diagnosed with epilepsy.   Id.   Plaintiff stated that he stopped drinking in March 2010.   (Tr. 43.)

Plaintiff testified that he smokes approximately one package of cigarettes a week.   Id.

In regard to his seizures, Plaintiff stated that he experiences approximately one seizure a week and does not know exactly what happens when he has a seizure.   (Tr. 44.)   He was last hospitalized for a seizure approximately two weeks prior to the hearing, at which time he went to the emergency room at that time but was not admitted.   Id.

Plaintiff stated that he has sustained injuries due to seizures.   Id.   The last time he went to the emergency room, he had a large knot on his head and a fractured wrist.   Id.   He did not know if anyone witnessed that seizure.   (Tr. 45.)

Plaintiff testified that his wife was not working at the time of the hearing.   Id.   His wife recently graduated from college with a degree in criminal justice.   (Tr. 46.)

Plaintiff testified that he has walked to restaurants to apply for jobs in the past, although he no longer does this.   (Tr. 47.)   He explained that he no longer feels comfortable being out by himself, and takes his fifteen-year-old son with when he goes to the store.   Id.

Plaintiff testified that he takes care of his kids by making sure they get on the bus, helping them with their homework, reading to them, and playing games with them.   Id.   He cooks dinner

[2]Dilantin is an antiepileptic drug indicated for the prevention and control of seizures.   See WebMD, http://www.webmd.com/drugs (last visited December 30, 2014).

for his kids--basically anything his kids request.   (Tr. 48.)

Plaintiff stated that he does not have a driver's license.   Id.   He lost his driver's license after receiving a DWI ten years prior to the hearing, and he has never tried to get it back.   Id. Plaintiff stated that he has only had one or two beers since March of 2010.   (Tr. 49.)

Plaintiff stated that he does not use any street drugs other than marijuana.   Id.

Plaintiff testified that he performs housework, cooks, does dishes, does laundry, and cuts the grass.   (Tr. 50-51.)   He goes to the grocery store with his wife.   (Tr. 51.)

Plaintiff testified that he last had a seizure approximately two weeks prior to the hearing. Id.   He did not know when he had a seizure before that time, but stated it was "maybe a month before that."   Id.

Plaintiff's attorney examined Plaintiff, who testified that he has been taking his Keppra as directed, except when he is unable to get it filled.   (Tr. 52.)   Plaintiff stated that it is not often that he is unable to fill his Keppra.   Id.

Plaintiff testified that he does not know how long his seizures last, but explained that he is disoriented after experiencing a seizure, does not know where he is or what he is doing, and his body aches.   (Tr. 53.)   The symptoms last "about an hour or so" following a seizure.   Id.   In addition, he is unable to perform any kind of activity or focus on any task immediately after having a seizure.   Id.   He is sometimes unable to stand or walk after having a seizure.   Id.   He tries to sit down and relax.   Id.   He often lies down most of the day following a seizure.   (Tr. 54.) Plaintiff stated that he has difficulties with focus and memory, which he attributes to the epilepsy. Id.   His seizures occur randomly, and he never knows when they are coming on.   Id.

As to the frequency of his seizures, Plaintiff said they occur "maybe once or twice a month" on average over the past one-year period.   (Tr. 55.)   His wife has told him that he has

seizures in his sleep.  Id.  Plaintiff testified that he often feels tired during the day.  Id.

The ALJ re-examined Plaintiff, who testified that he was taking Dilantin for seizures prior to March 2010, but he experienced a seizure at work for the first time in March 2010.  (Tr. 56.) Plaintiff stated that his seizures started occurring more frequently after March of 2010.  (Tr. 57.)

The ALJ next examined witness Leticia Mitchell, who testified that she had been married to Plaintiff for almost four years.  (Tr. 58.)  She testified that Plaintiff was having blackouts when they first started dating thirteen years prior to the hearing, and that the blackouts progressed into seizures.  Id.  She also stated that Plaintiff had his first big seizure in 2009, and that he was put on medication at that time.  (Tr. 59.)  She does not recall Plaintiff ever being off of his Dilantin for eight months.  Id.  She was aware that Plaintiff uses marijuana "socially," but she did not believe he used any other street drugs.  (Tr. 60.)

Ms. Mitchell testified that Plaintiff rode to school with her when she was taking classes because he did not have anything else to do.  (Tr. 61.)  She stated that Plaintiff used the computer while she was in class.  Id.

Plaintiff's attorney examined Ms. Mitchell and she confirmed that she has observed Plaintiff's seizures.  (Tr. 62.)  She stated that Plaintiff experiences two types of seizures:  "big" seizures and smaller "episodes."  Id.  She said that when Plaintiff has an episode, his eyes wander off, he does things with his hands, he makes sounds, and he drools, id.; the episodes occur mostly at night while Plaintiff is sleeping.  (Tr. 63.)  She indicated that Plaintiff is not aware he is having episodes because he is not conscious when they occur.  (Tr. 64.)  She stated that the episodes occur four to five nights a week, id., the small seizures affect Plaintiff's ability to sleep (Tr. 65), and that Plaintiff is fatigued during the day and is forgetful as a result.  Id.

Ms. Mitchell testified that Plaintiff experiences "big" seizures "a couple of times a week";

the big seizures last for "a few minutes." Id. She stated that Plaintiff can no longer pick up his kids from school due to seizures. Id. She stated that Plaintiff occasionally suffers from urinary incontinence during a seizure, id., and that Plaintiff has to lie down for "at least an hour" immediately following a big seizure (Tr. 66). Ms. Mitchell stated that Plaintiff is unable to function during this time because he is in pain. Id.

Ms. Mitchell testified that Plaintiff has been compliant with his medication since he was started on Keppra, he takes it every day, and it had been a long time since Plaintiff missed a dosage of Keppra as a result of not having the medication available. (Tr. 67.)

The ALJ re-examined Ms. Mitchell, who testified that she was surprised that hospital records revealed Plaintiff's Dilantin levels were low, because she watched Plaintiff take his medication regularly. (Tr. 68.)

Ms. Mitchell stated that Plaintiff uses marijuana "occasionally," id., and she believed Plaintiff's doctor is aware of it (Tr. 69).

Ms. Mitchell testified that Plaintiff experiences big seizures two to three times a week. Id. She stated that the seizures have been occurring at this level of frequency for about two months. Id. She added that Plaintiff was started on Keppra at that time, because the Dilantin was not effective. Id.

Ms. Mitchell stated that Plaintiff experienced blackouts when he was working at Tucker's. (Tr. 71-73.) She stated that he was able to work when he experienced the blackouts. Id. The blackouts progressed to full, shaking seizures and he was eventually terminated. Id. She said that Plaintiff had his first big seizure in 2009, at which time he was started on medication. (Tr. 73.) He was terminated when he had a big seizure at work in March of 2010. Id.

Ms. Mitchell stated that Plaintiff has never undergone a seizure study at a hospital. (Tr.

7

74.)

Plaintiff's attorney re-examined Ms. Mitchell, who testified that Plaintiff left his job in March 2010, because he had a big seizure at work for the first time. Id.

The ALJ examined vocational expert VE Linda Talley, who testified that Plaintiff's past work is classified as follows: busboy (unskilled, medium); cook (semiskilled, light); dishwasher (unskilled, medium); food server (semiskilled, light); warehouse worker (unskilled, medium); janitor (semiskilled, medium); and stock clerk (semiskilled, heavy). (Tr. 77.)

The ALJ asked the VE to assume a hypothetical claimant with Plaintiff's background and the following limitations: no exertional limitations except the individual can occasionally climb stairs and ramps; never climb ropes, ladders, or scaffolds; and must avoid concentrated exposure to hazards of machinery and heights. (Tr. 78.) The VE testified that the individual would be able to perform the positions of busboy, cook, dishwasher, and food server. Id.

The ALJ next asked the VE to assume the same hypothetical but the individual is limited to avoid even moderate exposure to the hazards of heights and machinery. (Tr. 79.) The VE testified that busboy and food server positions would remain. (Tr. 80.)

Finally, the ALJ asked the VE to assume the additional limitation of experiencing at least two episodes of seizures during the week, which take the individual off task at least one hour. Id. The VE testified that the individual would be unable to perform Plaintiff's past work or any other employment due to the amount of work missed. (Tr. 81.)

Plaintiff's attorney asked the VE to assume a hypothetical individual with Plaintiff's background and the limitation of being off task for at least one hour one time a week at unscheduled times due to the after effects of seizures. Id. The VE testified that such an individual would not generally be able to sustain employment, especially in entry-level positions

or the positions Plaintiff held.   (Tr. 82.)

**B.**   **Relevant Medical Records**

Plaintiff presented to St. Alexius Hospital on June 3, 2009, with reports of suffering a seizure just prior to arrival, which was witnessed by his wife.   (Tr. 299.)   Plaintiff was partially unresponsive and was shaking all over.   Id.   Plaintiff and his wife indicated that he had experienced less severe episodes of staring and drooling one to two times a week for two to three years.   Id.   Upon examination, Plaintiff was slow to respond, but was oriented and able to follow commands.   Id.   His cerebellar function, strength, reflexes, and sensation were normal.   Id.   Plaintiff underwent a CT scan of the head, which was normal.   (Tr. 291.)   A CT scan of the chest revealed questionable early pulmonary infiltrates.   (Tr. 293.)   Plaintiff was diagnosed with seizure disorder and was prescribed Dilantin.   (Tr. 300.)

Plaintiff presented to Grace Hill Neighborhood Health Services ("Grace Hill") on August 12, 2009, with complaints of seizures occurring five times a month with an onset of three months prior.   (Tr. 354.)   Plaintiff's seizures were described as primary-generalized-tonic-clonic.[3] Id.   Plaintiff reported symptoms of altered level of consciousness, aura, and unresponsiveness. Id.   Plaintiff's seizures were witnessed by his spouse.   Id.   No abnormalities were noted on examination.   (Tr. 354-55.)   Plaintiff was diagnosed with generalized convulsive epilepsy. (Tr. 355.)   Plaintiff was continued on Dilantin.   Id.

Plaintiff presented to the emergency room at St. Alexius Hospital on February 10, 2010, due to experiencing a seizure.   (Tr. 307.)   Plaintiff's symptoms had resolved in the emergency

---

[3]A generalized seizure characterized by the sudden onset of tonic contraction of the muscles often associated with a cry or moan, and frequently resulting in a fall to the ground.   The tonic phase of the seizure gradually give way to clonic convulsive movements occurring bilaterally and synchronously before slowing and eventually stopping, followed by a variable period of unconsciousness and gradual recovery.   Stedman's Medical Dictionary, 1744 (28th Ed. 2006).

room.   Id.   Plaintiff reported that he had not taken Dilantin since "last summer."   Id.
Plaintiff's affect was noted as being blunt.   Id.   Plaintiff started to seize as he was walking
back into an examination room.   Id.   Plaintiff had a grand mal seizure lasting approximately
two minutes.   Id.   Plaintiff underwent a CT scan of the head, which revealed no intracranial
abnormalities but noted ethmoid and right maxillary sinus disease.   (Tr. 317.)   Plaintiff was
diagnosed with recurrent seizure.   (Tr. 308.)   He was given a prescription of Dilantin.   Id.

Plaintiff presented to Saint Louis Connect Care ("Connect Care") on February 12, 2010,
for a neurology consult, upon the referral of his primary care provider.   (Tr. 323.)   Plaintiff
complained of epilepsy and pain all over his body.   Id.   Plaintiff reported blacking out while
walking, and noted that his friends saw all four extremities shaking.   Id.   Plaintiff reported a
seizure frequency of one to two per month on average, with occasional clusters of two times in
one day.   Id.   It was noted that Plaintiff started taking Dilantin eight months prior, but he
thought the seizures were more frequent with Dilantin, so he stopped medication until the day
prior to his appointment.   Id.   Plaintiff's wife reported two generalized tonic-clonic seizures
since May 2009, prior to which he experienced "blackouts" with drooling, staring, and
unresponsiveness.   Id.   Plaintiff was diagnosed with likely complex partial seizures,[4] and was
continued on Dilantin.   (Tr. 325.)   An MRI was also ordered.   Id.

Plaintiff presented to Grace Hill on June 22, 2010, with complaints of complex partial
seizures occurring two times a month.   (Tr. 358.)   Plaintiff reported symptoms of sleep
deprivation, tongue biting, and unresponsiveness.   Id.   Plaintiff was diagnosed with
generalized convulsive epilepsy, which was not well controlled.   (Tr. 360.)   Plaintiff's dosage

[4]A seizure with impairment of consciousness, occurring in a patient with focal epilepsy.
Stedman's at 1744.

of Dilantin was increased.    Id.

Plaintiff presented to Connect Care on August 27, 2010, with complaints of seizures. (Tr. 402.)   Plaintiff reported that he had experienced eight to ten seizures since his last visit in February of 2010.   Id.   Plaintiff reported that his last seizure was two weeks prior and occurred during church.   Id.   Plaintiff indicated that each seizure lasts five to twenty minutes, with a post ictal[5] period lasting thirty minutes, during which he is exhausted.   Id.)   Plaintiff also reported loss of short-term memories, including in his day-to-day life.   Id.   No abnormalities were noted on examination.   (Tr. 403-04.)   Plaintiff was diagnosed with recurrent seizures complex partial seizure/generalized tonic clonic seizure.   (Tr. 404.)   Additional testing was recommended, including an MRI of the brain.   Id.

Plaintiff underwent an MRI of the brain on September 27, 2010, which revealed a couple of nonspecific foci of increased signal intensity within the deep white matter; and bilateral retention cysts in the maxillary sinuses and mild bilateral sinus mucosal thickening; but was otherwise normal.   (Tr. 412-13.)

Plaintiff was taken to St. Alexius Hospital by ambulance on March 30, 2011, after being found unresponsive in an alley by neighbors.   (Tr. 378.)   Upon arrival of paramedics, Plaintiff was alert and oriented, but unable to tell what had happened.   (Id.)   Plaintiff had a laceration to his forehead and bruising to the nose.   Id.   Plaintiff complained of pain in his "entire face." Id.   Plaintiff underwent a facial bones CT scan, which revealed a bilateral acute nasal bone fracture.   (Tr. 382.)   Plaintiff also underwent a CT scan of the head, which revealed no acute intracranial process; sinus disease; and a right nasal bone fracture with soft tissue swelling.   (Tr. 384.)   It was noted that Plaintiff was "probably not taking his medications as his Dilantin level

[5]Following a seizure.   Stedman's at 1546.

11

is <2.5."   (Tr. 374.)   Plaintiff was diagnosed with seizure disorder, sub-therapeutic Dilantin level; nasal fracture; and substance abuse.   (Tr. 375.)   Plaintiff's dosage of Dilantin was increased.   Id.

Plaintiff presented to Grace Hill on April 1, 2011, at which time he reported experiencing complex partial seizures three times a month.   (Tr. 363.)   It was noted that Plaintiff's Dilantin levels were found to be low in the emergency room "even after he is taking 400 mg of dilantin." Id.   Plaintiff was diagnosed with generalized convulsive epilepsy.   (Tr. 365.)   The Dilantin was stopped, as there was no improvement, and he was started on Keppra.   Id.

Plaintiff presented to Connect Care on April 18, 2011, for follow-up regarding seizures. (Tr. 398.)   Plaintiff reported staring spells with shaking all over, lingual trauma, and bladder incontinence during his spells.   Id.   Plaintiff's last seizure was two weeks prior, at which time his medication was changed from Dilantin to Keppra.   Id.   Plaintiff reported no seizures or side effects since starting Keppra.   Id.   It was noted that Plaintiff had seizure free periods from August 2009 through February 2010, while taking Dilantin regularly, but developed frequent seizures forcing his initial visit to Connect care and re-starting treatment.   Id.   It was further noted that plaintiff had lost fifty pounds over a year.   Id.   Upon examination, Plaintiff's cognitive functioning was abnormal, as Plaintiff could only name president Obama; and his short-term memory was impaired in recall.   (Tr. 399.)   Plaintiff was diagnosed with partial complex seizures.   (Tr. 400.)   He was continued on Keppra.   Id.

Plaintiff returned to Connect Care for follow-up on June 20, 2011, at which time he reported experiencing nocturnal seizures a few weeks prior.   (Tr. 395.)   Plaintiff was taking 1000 mg of Keppra.   Id.   Plaintiff was a "very poor historian," and was not able to describe the detail of his seizures.   Id.   Plaintiff's dosage of Keppra was increased to 1500 mg, and he was

instructed to bring his wife to his next appointment.   Id.

**Evidence Submitted to the Appeals Council**

Plaintiff underwent an EEG at Barnes-Jewish Hospital on March 22, 2010, which was normal.   (Tr. 518.)   It was noted that a "normal EEG does not exclude a diagnosis of epilepsy."   Id.

Plaintiff presented to the emergency room at Barnes-Jewish Hospital on April 23, 2010, after experiencing a witnessed seizure.   (Tr. 481.)   Plaintiff had a laceration to his left eyebrow.   Id.   It was noted that Plaintiff blacked out at work, after he missed doses of his seizure medication.   (Tr. 486.)   Plaintiff was prescribed Dilantin.   (Tr. 488.)

Plaintiff presented to the emergency room at St. Alexius Hospital on June 21, 2010, with complaints of shortness of breath after "smoking a joint" that morning.   (Tr. 467.)   Plaintiff reported that he had experienced a seizure three days prior and was still stiff from the seizure. (Tr. 470.)   Upon, examination, Plaintiff's affect was blunt.   (Tr. 467.)   Plaintiff was administered Dilantin and discharged.   (Tr. 467-68.)

Plaintiff presented to the emergency room at St. Alexius Hospital on November 22, 2010, after experiencing a witnessed seizure.   (Tr. 454.)   Plaintiff was noted to be post-ictal upon arrival.   (Id.)   Plaintiff reported that he had been out of Dilantin for three weeks, and that his last seizure activity was four to five weeks prior.   Id.   Plaintiff was administered Dilantin via IV.   (Tr. 455.)

Plaintiff presented to the emergency room at St. Alexius Hospital on October 18, 2011, after experiencing a seizure witnessed by his wife.   (Tr. 434.)   Plaintiff awoke from sleep having a seizure.   Id.   He was completely unresponsive and was "shaking all over."   Id. Plaintiff was post-ictal for about ten minutes after the arrival of EMS.   (Tr. 437.)   Plaintiff's

symptoms had resolved in the emergency room.   Id.   Plaintiff reported that he had been

compliant with his medications, and that he had experienced a seizure the previous week also.

Id.

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since April 28, 2010, the alleged onset date.   (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: seizure disorder and a history of polysubstance abuse (marijuana).   (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: the claimant can only climb stairs and ramps occasionally; the claimant can never climb ropes, ladders, or scaffolds; and the claimant must avoid even moderate exposure to hazards of heights and machinery.

6. The record is insufficient to determine whether the claimant can perform any past relevant work.   (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 8, 1979 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.   (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English.   (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 28, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-18.)

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on April 28, 2010, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on April 28, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 18.)

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.   See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).   The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.   See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).   Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.   See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).   If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.   See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.   See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996).   "[T]he court must also take into consideration the weight of the evidence in

the record and apply a balancing test to evidence which is contrary."   Burress v. Apfel, 141 F.3d

875, 878 (8th Cir. 1998).   The analysis required has been described as a "searching inquiry."   Id.

**B.**      **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of not

less than 12 months."   42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).   The claimant has

the burden of proving that s/he has a disabling impairment.   See Ingram v. Chater, 107 F.3d 598,

601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.   See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137,

141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).   First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."   If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).   Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.

 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).   To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities."   Id.

Age, education, and work experience of a claimant are not considered in making the "severity"

determination.   See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education, and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e),

416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. <u>See</u> 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. <u>See</u> <u>id.</u> Next, the Commissioner must determine the severity of the impairment based on those ratings. <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. <u>See</u> <u>id.</u> If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); <u>Pratt</u>, 956 F.2d at 834-35; <u>Jones v. Callahan</u>, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining his RFC.    Specifically, Plaintiff argues that the ALJ erred by improperly evaluating the treatment records, failing to include sufficient limitations arising from Plaintiff's seizure disorder, and in assessing the credibility of his subjective complaints.

The ALJ made the following determination with regard to plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: the claimant can only climb stairs and ramps occasionally; the claimant can never climb ropes, ladders, or scaffolds; and the claimant must avoid even moderate exposure to hazards of heights and machinery.

(Tr. 13.)

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations.    Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.    See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).    Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.    See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).    An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.    See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

In determining plaintiff's RFC, the ALJ evaluated the credibility of Plaintiff's subjective complaints of pain and limitations. An ALJ may discredit a claimant's subjective allegations of disabling symptoms to the extent they are inconsistent with the overall record as a whole, including: the objective medical evidence and medical opinion evidence; the claimant's daily activities; the duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medications and medical treatment; and the claimant's self-imposed restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529; SSR 96-7p.

The ALJ cited the following factors in discrediting Plaintiff's subjective complaints of limitations: (1) Plaintiff sought emergency treatment for seizures infrequently; (2) the medical evidence reveals minimal objective findings; (3) Plaintiff was noncompliant with seizure medication; (4) Plaintiff used marijuana recreationally; (5) Plaintiff engaged in significant daily activities; and (6) Plaintiff's wife's testimony regarding the frequency of Plaintiff's seizures was inconsistent with Plaintiff's own testimony. (Tr. 25-28). The ALJ properly found that these factors detracted from the credibility of Plaintiff's subjective complaints.

The ALJ also summarized the medical evidence. The ALJ stated that Plaintiff's seizure disorder "is demonstrated in the record only by three trips to hospital emergency departments and by reports of seizure activity that were related to medical professionals by the claimant and his wife during routine office visits." (Tr. 14.) The ALJ discussed Plaintiff's visits to the emergency room. The ALJ noted that in June 2009, Plaintiff complained of a "possible" seizure and demonstrated no more than mild symptoms while in the emergency department. Id. The ALJ stated that Plaintiff presented to the emergency room in February 2010, at which time Plaintiff's reported symptoms were described as "moderate, severe" at worst, and Plaintiff demonstrated no symptoms while in the emergency department. Id. Finally, the ALJ stated

that Plaintiff was hospitalized in March 2011, after "reportedly suffering from another seizure." Id. The ALJ noted that the only significant findings upon examination were lacerations to Plaintiff's face and hands, bruises on his nose and cheeks, and old blood on his ears/hair. Id. The ALJ pointed out that Plaintiff's first two hospitalizations-in June 2009 and February 2010-occurred prior to Plaintiff's alleged onset date of disability. (Tr. 15.)

The undersigned finds that the ALJ mischaracterized the medical evidence regarding Plaintiff's seizure disorder. First, although the ALJ states that Plaintiff demonstrated either mild or no symptoms in the emergency room, treatment notes reveal that Plaintiff's seizures had ended by the time he reached the emergency room. As such, Plaintiff would be expected to demonstrate only post-ictal symptoms upon arrival. The record reveals Plaintiff did in fact demonstrate such symptoms. For example, during his June 2009 hospitalization, it was noted that Plaintiff was slow to respond on examination. (Tr. 299.) In February 2010, Plaintiff's affect was noted as being blunt. (Tr. 307.) In addition, Plaintiff started to seize as he was walking to an examination room, and experienced a grand mal seizure lasting approximately two minutes. Id. The ALJ omitted this fact. In March 2011, Plaintiff was found unresponsive in an alley by neighbors. (Tr. 378.) Upon the arrival of paramedics, Plaintiff was alert and oriented, but unable to tell what had happened. Id. Plaintiff had a laceration to his forehead and bruising to the nose. Id. On each of his hospitalizations, Plaintiff was diagnosed with seizure disorder and prescribed Dilantin.

Second, Plaintiff regularly reported seizure activity to his physicians, both prior to and after his alleged onset date. The ALJ characterizes Plaintiff's visits as "routine," but it appears that Plaintiff sought treatment specifically for seizures on a regular basis, and there is no indication that Plaintiff's treating physicians questioned whether Plaintiff was experiencing

21

seizures.    For example, Plaintiff was referred to Connect Care for a neurology consult by his primary care provider in February 2010.    (Tr. 323.)    Plaintiff was diagnosed with likely complex partial seizures, and was continued on Dilantin.    (Tr. 325.)    Plaintiff continued to see physicians at both Connect Care and Grace Hill for treatment of his seizures after his alleged onset date.    These physicians prescribed and adjusted the dosage of Plaintiff's Dilantin.    (Tr. 325, 360, 404.)    On April 1, 2011, Plaintiff was started on Keppra, due to the ineffectiveness of Dilantin.    (Tr. 365.)    Plaintiff reported experiencing complex partial seizures three times a month at that time.    (Tr. 363.)    Plaintiff's dosage of Keppra was increased in June 2011.    (Tr. 395.)    The medical record supports the presence of seizures, which increased in frequency subsequent to Plaintiff's onset of disability date.

The ALJ next stated that objective medical testing of Plaintiff has been unremarkable. Id.    The ALJ cited a June 2009 head CT, which demonstrated minimal right-sided ethmoid disease, but was otherwise normal; a February 2010 radiological examination which was similarly unremarkable; a September 2010 MRI which noted a couple of nonspecific foci of increased signal intensity within the deep white matter but was otherwise normal; and a March 2011 head CT scan which noted no significant findings.    (Tr. 14-15.)    The ALJ concluded that none of these results were interpreted as demonstrating the existence of a severe seizure disorder. (Tr. 15.)    The ALJ also pointed out that Plaintiff does not suffer from long-term neurological deficits resulting from any of his reported seizures.    Id.

While the ALJ accurately summarized the findings of objective testing, the lack of objective evidence of seizure activity on testing does not support the ALJ's finding that Plaintiff's seizure disorder was not severe.    As discussed above, Plaintiff's seizures have been observed by third parties, including staff at St. Alexius Hospital in February 2010.    (Tr. 307.)

The ALJ further stated that Plaintiff has not "suffered any injuries typically associated with seizure activity, such as tongue lacerations." (Tr. 15.) The record reveals that Plaintiff did in fact report "tongue biting" during seizures to providers at Grace Hill in June 2010. (Tr. 358.) In addition, as acknowledged by the ALJ, Plaintiff suffered face and hand lacerations in March 2011. (Tr. 15, 378.) The ALJ stated that "no causal connection" between Plaintiff's injuries and seizures were noted. (Tr. 15.) There is no indication in the record, however, that medical staff doubted whether Plaintiff had experienced a seizure or that Plaintiff's injuries were caused by the seizure. Id.

Finally, the ALJ noted that Plaintiff's three hospitalizations occurred either before Plaintiff began his seizure disorder treatment regimen or when Plaintiff was non-compliant with that treatment regimen. Id. The ALJ also pointed out Plaintiff was able to utilize Dilantin with good results in 2009. Id. The ALJ concluded that Plaintiff's seizure disorder can be successfully managed with medication and "is, therefore, not as significant an impairment as alleged by the claimant." Id. It is true that the three hospitalizations contained in the record before the ALJ all occurred either prior to the time Plaintiff began anti-seizure medication or during periods when Plaintiff was not taking medication. However, the record also reveals that Plaintiff reported experiencing seizures to physicians at Connect Care and Grace Hill even when he was compliant with his medications, which caused his physicians to either increase the dosage of his medication or change his medication. (Tr. 358, 402, 365, 398, 395.) It is also notable that Plaintiff reported to providers at Connect Care in February of 2010 that he had stopped taking Dilantin because he believed the seizures were more frequent with Dilantin. (Tr. 323.)

Plaintiff also points out that several emergency room visits were documented in new and material evidence submitted to the Appeals Council. When a plaintiff presents new evidence to

23

the Appeals Council, the regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision.   20 C.F.R. § 404.970(b); <u>Cunningham v. Apfel</u>, 222 F.3d 496, 500 (8th Cir. 2000).   The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record.   <u>Id.</u>   This Court does not review the Appeal's Council's denial, but determines whether the record as a whole, including the new evidence, supports the ALJ's determination.   <u>Id.</u>

The evidence submitted to the Appeals Council contains two additional hospitalizations for seizures during the relevant period, one hospitalization after the ALJ's decision, and the report from an EEG Plaintiff underwent during the relevant period.   On April 23, 2010, Plaintiff presented to the emergency room at Barnes-Jewish hospital after experiencing a witnessed seizure.   (Tr. 481.)   Plaintiff had a laceration to his left eyebrow.   <u>Id.</u>   It was noted that Plaintiff had blacked out at work and that he had missed doses of seizure medication.   (Tr. 486.)   On November 22, 2010, Plaintiff presented to the emergency room after experiencing a witnessed seizure.   (Tr. 454.)   Plaintiff was noted to be post-ictal upon arrival.   <u>Id.</u>   Plaintiff reported that he had been out of Dilantin for three weeks.   <u>Id.</u>   On October 18, 2011, one week after the ALJ's determination, Plaintiff presented to the emergency room after experienced a witnessed seizure.   (Tr. 434.)   Plaintiff was post-ictal for about ten minutes after the arrival of EMS.   (Tr. 437.)   Plaintiff reported that he had been compliant with his medications, and that he had experienced a seizure the previous week as well.   <u>Id.</u>   Finally, Plaintiff underwent an EEG on March 22, 2010, which was normal.   (Tr. 518.)   It was noted, however, that a "normal EEG does not exclude a diagnosis of epilepsy."   <u>Id.</u>

After careful review of the entire record, including the new evidence, the undersigned

finds that the RFC formulated by the ALJ is not supported by substantial evidence.    As

discussed above, the ALJ mischaracterized the medical evidence regarding Plaintiff's seizure

disorder.    The ALJ acknowledged that Plaintiff's seizure disorder was a severe impairment, yet

he failed to adequately incorporate limitations resulting from Plaintiff's seizure disorder.    Most

significantly, the ALJ did not account for Plaintiff missing work or being off task while

experiencing a seizure or during the post ictal period.    Plaintiff also testified that he experiences

seizures at night, which results in fatigue and difficulties with focus and memory.    (Tr. 54.)

The medical record supports Plaintiff's memory difficulties, as Plaintiff's short-term memory was

found to be impaired in April 2011.    (Tr. 399.)    As noted by the ALJ, the record does contain

evidence of noncompliance with medication.    The record also reveals, however, that Plaintiff

continued to experience seizures even when compliant with medication.

Notably, there is no opinion from any physician, treating or otherwise, regarding

Plaintiff's functional limitations.    An ALJ's RFC assessment must be based on some medical

evidence of the claimant's ability to function in the workplace and must discuss and describe how

such evidence supports each RFC conclusion.    Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir.

2010); Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001); Soc. Sec. Ruling 96-8p, 1996 WL

374184, at *7 (Soc. Sec. Admin. July 2, 1996).    Thus, the ALJ is encouraged upon remand to

obtain evidence from treating providers of how Plaintiff's impairments affect his ability to engage

in specific work-related activities.    See Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir.

2002).

Accordingly, the undersigned recommends that this matter be reversed and remanded to

the ALJ in order for the ALJ to properly consider the medical evidence of record, including the

new evidence submitted to the Appeals Council; obtain evidence regarding Plaintiff's ability to

function in the workplace; formulate a new residual functional capacity for plaintiff based on the evidence in the record; and proceed with the sequential analysis.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated:   February 13, 2015

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE